WILLIAM L. SLATER et al., Administrators, etc., Respondents, *v.* HUGH J. JEWETT as Receiver, etc., Appellant.

The measure of a master's duty to his servant is reasonable care, having relation to the parties, the business in which they are engaged, and the exigencies which require vigilance and attention; he is not a guarantor of the safety of his servant.

The fact that one employe upon a railroad is hired and discharged by one superior agent and another by another does not affect the relation of the employes to each other as fellow-servants.

A company or individual operating a railroad has the right, as regards employes, to vary from the regular time-table in the running of trains ; all that is required is due care and diligence in giving notice of the change and in running the train upon the changed time.

It is not required that the master should see to it personally that notice of such a change comes to the knowledge of all those to be governed thereby. If there is due care and diligence in choosing competent persons to receive and transmit the necessary orders, a negligence by them in the performance of it is a risk of the employment that the co-employe takes when he enters the service. The duty of the master is performed when he provides beforehand and makes known to his servants rules explicit and efficient, which, if observed and followed by all concerned, will bring personal notice to every one entitled to it.

Where regulations for the running of trains out of time, proper and suitable, with a view to the safety of employes, are prescribed, obedience to these regulations by those having charge of a train is matter of executive detail; and for a disobedience of them, which causes injury to a co-employe, the master is not liable.

*It seems* that the courts may take judicial notice of the way in which the great railways are managed in the every-day practical running of them, *i. e.*, by overlooking officers at distant places, who by means of the telegraph are advised where trains are, and direct their movements.

S., plaintiffs' intestate, was a fireman upon a train running upon a railroad operated by defendant as receiver. He was killed by a collision between his train and another. It was the custom, and was prescribed by the general regulations for the running of trains on said road, that when trains were behind time they should be moved in accordance with special telegraphic orders from the train dispatcher, to be communicated by the telegraph operators receiving them to the conductor and engineer of the train, in the presence of each other. An order was so sent directing where the train which collided with the train upon which S. was should meet the latter. The operator communicated it to the conductor but not to the engineer ; the conductor, without the authority or assent of the engineer, signed the name of the latter in acknowledgment of receipt of the order, and the train dispatcher was advised that the order had been correctly delivered. The conductor forgot to deliver the order to the engineer, who, in ignorance of it, instead of waiting at the station designated until the other train came up, proceeded with his train and the collision occurred. In an action to recover damages there was no evidence but that the operator and conductor were competent and skillful when employed. It did appear that defendant's rules and regulations were well devised for safety, and had been in use for a number of years without occasioning any accident. *Held*, that the negligence was that of fel-

low-servants of the intestate in the same common employment, for which defendant was not liable.

*Flike* v. *B. & A. R. R. Co.* (53 N. Y. 549), *Fuller* v. *Jewett* (80 id. 46), *Crispin* v. *Babbitt* (81 id. 516), distinguished.

(Argued January 22, 1881 ; decided April 19, 1881.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, in favor of plaintiffs, entered upon an order made January 6, 1880, denying a motion for a new trial and directing judgment on a verdict.

· The nature of the action and the material facts are stated in the opinion.

*John G. Milburn* for appellant.    A master is bound to use ordinary and reasonable care in the selection of competent servants, in furnishing them with suitable means and appliances necessary in the business, and in providing proper rules and regulations for the conduct of the business where such are necessary.    ( *Wright* v. *N. Y. C. R. R. Co.*, 25 N. Y. 562 ; Shearman & Redfield on Negligence, §§ 90, 92, 93.)    A master is always liable for negligence in respect to such acts and duties as he is required to perform and discharge as master, without regard to the rank or title of the agent intrusted with their performance.    (*Laning* v. *N. Y. C. R. R. Co.*, 49 N. Y. 521 ; *Flike* v. *Boston R. R. Co.*, 53 id. 549, 553; *Crispen* v. *Babbitt* [Ct. of Appeals, Sept. 21, 1880], 10 N. Y. Weekly Dig. 512.)    The term "fellow-servant" includes all who serve the same master, work under the same control, derive authority and compensation from the same source, and are engaged in the same general business, though it may be in different grades and departments of it. (Wood on Master and Servant, § 435; *Farwell* v. *B. & W. R. R. Co.*, 4 Metc. 49; *Coons* v. *S. & W. R. R. Co.*, 6 Barb. 231; S. C., 1 Seld. 492; *Sherman* v. *R. & S. Ry. Co.*, 17 N. Y. 153; *Boldt* v. *N. Y. C. R. R. Co.*, 18 id. 432; *Wright* v. *N. Y. C. R. R. Co.*, 25 id. 562; *Laning* v. *N. Y. C. R. R. Co.*, 49 id. 521; *Sammon* v. *N. Y. & Harlem R. R. Co.*, 52 id. 251; *Malone* v.

*Hathaway*, 64 id. 5 ; *Besel* v. *N. Y. C. & H. R. R. R. Co.*, 70 id. 171 ; *Salters* v. *D. & H. C. Co.*, 3 Hun, 338 ; *Moran* v. *N. Y. C. & H. R. R. R. R. Co.*, 3 N. Y. S. C. [T. & C.] 770 ; *Ross* v. *N. Y. C. & H. R. R. R. Co.*, 5 Hun, 488 ; 2 Thompson on Negligence, 1034, 1037.) The exemption of the master extends to all who are fellow-servants, and not simply to those who are fellow-servants in the same department of duty. (*Farwell* v. *B. & W. R. R. Co.*, 4 Metc. 49 ; *Coon* v. *Syracuse & U. R. R. Co.*, 1 Seld. 492 ; *Flike* v. *B. &. A. R. R. Co.*, 53 N. Y. 549, 553 ; *Boldt* v. *N. Y. C. R. R. Co.*, 18 id. 432, 433 ; *Russell* v. *Hudson Riv. R. R. Co.*, 17 id. 134 ; *Wright* v. *N. Y. C.*, 25 id. 562, 565 ; *Laning* v. *N. Y. C.*, 49 id. 521, 528 ; *Sherman* v. *R. & S. Ry. Co.*, 17 id. 153 ; *Hofnagle* v. *N. Y. C.*, 55 id. 608 ; *Malone* v. *Hathaway*, 64 id. 5 ; *Lehigh Valley Co.* v. *Jones*, 86 Penn. St. 432 ; *Henry* v. *Staten Island R. R. Co.*, 10 N. Y. Weekly Dig. 430 ; *Seaver* v. *Boston R. R. Co.*, 14 Gray, 466 ; *Gilshannon* v. *R. R. Co.*, 10 Cush. 228 ; *Tunney* v. *R. R. Co.*, L. R., 1 C. P. D. 291 ; *Sammon* v. *N. Y. & H. R. R. Co.*, 62 N. Y. 251 ; *Besel* v. *N. Y. C. & H. R. R. Co.*, 70 id. 171 ; *Gilman* v. *R. R. Co.*, 10 Allen, 235 ; *Salters* v. *B. & A. R. R. Co.*, 3 Hun, 388 ; *Moran* v. *N. Y. & H. R. R. Co.*, 3 N. Y. S. C. [T. & C.] 770 ; *Hughes* v. *R. R. Co.*, 49 Miss. 256 ; *Hutchinson* v. *R. R. Co.*, 5 Exch. 343 ; *Sherman* v. *R. & S. Ry. Co.*, 17 N. Y. 153 ; 2 Thompson on Negligence, 1038 ; *Chapman* v. *Erie Railway Co.*, 55 N. Y. 579.) The negligence of Mead and McDonald was not within the limitation or exception which excludes from the operation of the rule the negligence of a servant when he is acting in the place and stead of the master. (Wood on Master and Servant, §§ 438, 448, 449 ; *Laning* v. *N. Y. C. & H. R. R. R. Co.*, 49 N. Y. 521 ; *Brickner* v. *N. Y. C. & H. R. R. R. Co.*, 2 Lans. 506 ; *Flike* v. *B. & A. R. R. Co.*, 53 N. Y. 549 ; *Hofnagle* v. *N. Y. C. & H. R. R. R. Co.*, 55 id. 608 ; *Rose* v. *B. & A. R. R. Co.*, 58 id. 217 ; *Malone* v. *Hathaway*, 64 id. 5 ; *Besel* v. *N. Y. C. & H. R. R. R. Co.*, 70 id. 171 ; *Crispin* v. *Babbitt*, 10 N. Y. Weekly Dig. 512 ; *Wright* v. *N. Y. C. R. R.*

*Co.*, 25 N. Y. 568.) The court erred in its charge to the jury that whatever acts the agents appointed by the defendant do are in law the acts of the defendant. (*Farwell* v. *B. & W. R. R. Co.*, 4 Metc. 49 ; *Coon* v. *S. & U. R. R. Co.*, 6 Barb. 231, 237 ; *Flike* v. *B. & A. R. R. Co.*, 53 N. Y. 549, 552 ; *Leonard* v. *Collins*, 70 id. 90 ; *Chapman* v. *Erie Ry. Co.*, 55 id. 579.) The duty of the master to his servant is only to exercise ordinary care. (*Leonard* v. *Collins*, 70 N. Y. 90 ; *Warner* v. *Erie Ry. Co.*, 39 id. 468.) It is presumed that the master has performed his duty ; negligence in hiring or retaining must be proved. The burden is on the plaintiff to establish negligence in this regard. (Wood on Master and Servant, §§ 419, 420 ; *Chapman* v. *Erie Ry. Co.*, 55 N. Y. 579 ; *Baulec* v. *N. Y. C. & H. R. R. R. Co.*, 59 id. 356.)

*James F. Gluck* for respondent. The plaintiff's intestate was himself entirely free from negligence. (Wood's Master and Servant, 779.) When employed by the master to communicate to servants an order of the master changing the time-table given those servants previously by the master, the telegraph operator was not a co-employe of the engineer, nor of the fireman, plaintiff's intestate. (*Laning* v. *N. Y. C. R. R. Co.*, 49 N. Y. 528 ; *Flike* v. *The N. Y. C. R. R. Co.*, 53 id. 549 ; *Hofnagle* v. *N. Y. C.*, 55 id. 608 ; *Rose* v. *B. & A. Ry. Co.* [Ct. of App.] 9 Am. Ry. Rep. 515 ; *Buckner* v. *N. Y. C. R. R. Co.*, 2 Lans. 506 ; *Laning* v. *N. Y. C.*, 49 N. Y. 672 ; *Wilson* v. *Murray*, 1 Sc. App. 326 ; 16 Am. Rep. 496, 497.) The superintendent, assistant superintendent and his assistants are officers and not servants. (*Chicago, B. & Q. R. R. Co.* v. *McLallen, Adm'r*, 84 Ill. 109 ; Am. Ry. Rep. 425 ; *Washburn* v. *R. R. Co.*, 3 Head [Tenn.], 638 ; *Railroad Co.* v. *Fort*, 17 Wall. [U. S.] 558, 559 ; *Siegel* v. *Schantz*, 2 T. & C. [N. Y.] 353 ; Master and Servant, p. 769 ; *Le Barron* v. *East Boston Ferry Co.*, 11 Mass. 312 ; Wood's Master and Servant, 905 ; *R. R. Co.* v. *Keary*, 3 Ohio St. 201 ; *Rose* v. *B. & A. R. R. Co.*, 58 N. Y. 221 ; 17 Wall. [U. S.] 558, 559.) Assuming that the operator and the fireman were co-employes, it be-

came a question for the jury to determine whether or not the risk in question was one assumed by the employe in his implied contract with the defendant. (Wharton on Negligence, 197, § 217; Shearman & Redfield on Negligence [3d ed.], § 103; Wood on Master and Servant, 713, 714; *Laning* v. *N. Y. C. R. R. Co.*, 49 N. Y. 527; *Union Pacific* v. *Melliken*, 8 Kans. 647; 5 Am. Ry. Rep. 416.) The rule which holds the master not liable for injuries sustained by an employe at the hands of a co-employe does not here apply, and the further extension of the rule to a new application is against public policy and the tendency of judicial opinion. (Pierce's Am. Ry. Law, 289; Shearman & Redfield on Negligence [3d ed.], 114, §§ 96, 102, 105; *Flike* v. *N. Y. C. R. R. Co.*, 53 N. Y. 556.)

FOLGER, Ch. J. This action is brought by the plaintiffs, as administrators, to recover damages for the death of Adelbert D. Slater, their intestate. The cause of his death was the collision of two engines, each drawing a train on the Erie railway operated by the defendant as receiver. It is claimed that the collision happened from negligence, chargeable to the defendant, though not proceeding immediately from him. The intestate was in the service of the defendant, as a fireman on one of the engines that came together. The immediate negligence that caused the accident and the death was that of the conductor on the train meeting that on which the intestate was serving, co-operating with that of a telegraphic operator at Salamanca, a station on the defendant's road. The latter having omitted to give to the engineer the orders received from the train dispatcher as to the place where the two trains should meet, which his instructions required him to do, and having reported a performance of his duty, and the former having signed the engineer's name, without his knowledge, to an acknowledgment and receipt of order, and then having failed to communicate the order to him; in consequence of which the engineer went on with his train, instead of waiting at the station designated until the other train came up.

The complaint avers, that it was the duty of the defendant

to employ competent, trustworthy and skillful men, and to make proper regulations for the running of his trains so as to insure the safety of persons operating the same, and to provide, as far as practicable, against accident and injury to them in their employment, and in the performance of their service for him. This averment correctly states the duty of the defendant, unless it overstates it, when it sets his duty at so high a mark, as that of an insurer of the safety of his servants. The measure of the master's duty to his servant is reasonable care, having relation to the parties, to the business in which they are engaged, and the exigencies which require vigilance and attention, and conforming to the circumstances in which it is to be exerted. We agree that the defendant was bound to do all else that the averment puts upon him, unless it is read as making him a guarantor of the safety of his servants. The complaint avers that the defendant failed to employ proper and competent persons to manage and run his trains, and proper and suitable persons to give orders and information in respect thereto and properly to communicate the same to engineers and conductors of trains; and that he failed to make and enforce proper and reasonable rules and regulations for the running of his trains. The proofs of the plaintiffs did not seek to introduce into the case any other element of lack of duty in the defendant than these thus averred. And we think that the case is clear upon the proofs, that the defendant made no failure of duty, unless it was in the enforcement of the rules and regulations made by him for the running of his trains. Whether he failed in that is, we think, a question of law properly brought up by some of the exceptions taken at Circuit by the defendant. It is not to be questioned that the telegraph operator and the conductor of the train were negligent, and that, from their careless omission of duty and disobedience ot rules, the accident resulted. The rules that had been given to them for their guidance had been prepared with great care, were minute, explicit and plain, and exceedingly well devised for safety. They had been in operation for several years before the disaster, and no accident had

ever taken place in the use of them. The train-dispatcher, who, concededly, was in the place of the defendant, had strictly observed these rules in this instance, and had received all the assurance needful and required by them, that they had been observed by all concerned.

Some contention was made on the argument, that there was no proof that it was not an exceptional and unprecedented thing to interfere, as was done in this instance, with the moving of the two trains, and that no cause was shown for an interference with them. The case shows clearly that it was the usage of the defendant and his predecessor, The Erie Railway Company, to govern and direct the movement of - trains by such order, and that ·there was reason for it in this instance. The order given was a special one, by reason of delay; but by special is not to be understood unusual and unprovided for. For nine years these rules had been in operation, and the witness who testifies to that, so applies his words as to plainly indicate that they had been in use in giving like directions to engineers and conductors on like occasions of delay. The proof shows that the time-card is the general order, and it comes from the superintendent. An order varying it on a special occasion comes from the train-dispatcher. The special order is as much provided for by the general regulations as the general time-card or other general rules. It is the conductor's duty to obey the special order, which supersedes, for the particular train, the general order. A special order to stop at a station, having been received, there is no right to go beyond that station until further direction. The rules proven and set forth in the case recognize the usage to stop and move trains by special order varying for the nonce the general time-card. Indeed, as we may take judicial notice of the way in which banks and like public institutions do business (*Agawam Bank* v. *Strever*, 18 N. Y. 502), so may we, that the great railways of the land are managed in the every-day practical running of them, by overlooking officers at distant places, who use the telegraph wires to keep all the while informed where trains are, and to

direct their movements from hour to hour.   We have presented
to us in this case, then, general regulations well calculated to
insure safety in the running of the trains; a usage well un-
derstood, and provided for in these general regulations, to vary
some particulars of these general rules on special occasions by
special orders; specific, well-devised and promulgated rules
for the mode of doing so with safety; an occasion arising for
the giving of a special order to these two trains; a complete
observance of all these regulations, by an officer who was in the
stead of the defendant; an assurance to him that they had
been observed by others; and the use by him, to bring his
special order to the mind of the agents in charge of the trains,
of the customary means that had been safe and efficient for a
series of years.   We need not say that there was no fault in the
higher officers of the defendant, for it is the law of the case,
given to the jury by the trial court, that there was not.   The
personal failure of duty was in the telegraph operator and the
conductor.

   Each of those agents, in doing their ordinary work for the
defendant, were fellow-servants of the intestate, in the same
common employment.   The conductor was engaged in the
particular work in which the intestate was — that of moving
trains.   The telegrapher was engaged in a work closely con-
nected therewith — that of receiving and giving information of
the whereabouts of trains and communicating orders to those
controlling them for stopping or going on.   This was a branch
of the general business of the defendant essential to the smooth
and successful movement of the whole — that branch of it
in which the intestate was engaged as much as any other.   No
question seems to have been made on the trial but that
the operator and conductor were competent and skillful when
the defendant took them into his employ.   It cannot be con-
tended that there was any thing required of the conductor
that raised him out of his relation to the intestate of a fellow-
servant.   The act required of the conductor, at the particular
time, was to receive an order from an authorized source of com-

mand, and in a prescribed mode to acknowledge the receipt of it, and then to follow the direction. This was service merely. It is contended that the duty of the telegrapher at the time and the act required of him were those that the defendant was bound to perform as master, and that the negligent perform- ance by the operator was the negligence of the master.

The argument to sustain this position consists, in part, in an effort to show that the duties of the operator were in no re- spect like to those of the intestate. They were not like, but they tended to the same end — that of the speedy, efficient and successful carriage of passengers and freight over the railway. There are many kinds of servants of a great railway company. Their duties are not in all cases the same, nor always like, yet they are all done to bring one result, and it is their conjoint simultaneous and harmonious performance that does effect the finality, sought through the whole complex organism. If it be so that this operator sometimes received and sent messages that had naught to do therewith, still, on this occasion, the act required of him had direct connection with the acts of those engaged in moving the two trains. The position, that the operator was hired and discharged by one superior agent, and the intestate by another, and that, therefore, they were not fel- low-servants, is not sound. The general authority to hire and to turn away was in the defendant. It did radiate from him through different chiefs of department in his general work. His, however, was the ultimate power. The heads of bureaus were not independent contractors, doing a branch of his work on their own responsibility, and free from his interference with their subordinates. He had the right to step into their spheres of duty and act for himself.

There is more plausibility in the position, that the act that was to be done on this occasion was so essentially one for the master to do in his duty to his servants, that whatever subordi- nate was taken by him to do it, came to be the master in doing it. It is urged, and with reason, that clearly arranging and promulgating the general time-table of a great railway is the duty and the act of the master of it ; that when there is a varia-

tion from the general time-table for a special occasion and pur-
pose, it is as much the duty and act of the master, and he is as
much required to perform it; that it is the duty and act of the
master to see and know that his general time-table is brought
to the knowledge of his servants who are to square their ac-
tions to it; that the same is his duty and act as to a variation
from it, which is but a special time-table; and that, therefore,
whoever he uses to bring those time-tables to the notice of his
servants, he puts that person in his place to do an act in his
stead, inasmuch as the responsibility is upon him to see and
know that it is done and done effectually; and that if, instead
of doing it in person, he chooses to do it through an agent,
that agent, *pro hac vice*, is he, the master, and he, the master, is
responsible for a negligent act therein of that agent whereby a
fellow-servant of him is harmed.    The rule has been laid down
in repeated cases in this court, in terms so broad as to come
close to this case.    (*Flike* v. *B. & A. R. R. Co.*, 53 N. Y.
549; *Fuller* v. *Jewett*, 80 id. 46; *Crispin* v. *Babbitt*, 81 id. 516.)
Attentive consideration, however, will perceive a distinction be-
tween the cases.    That the master has the right, as regards his
servants, to vary from the time-table that he has set cannot be
doubted.    It is at times a necessity so to do, and a necessity so
frequent as to fall within the occurrences that a railway servant is
bound to expect in the course of his employment.    Even as
regards the public and passengers, a railway manager has a
right, when needs press, to vary from his general time-table.
All that can then be required from him, by the public and
passengers is that when he makes the variation he act under
it with reasonable care and diligence (*Sears* v. *East. R. R. Co.*,
14 Allen, 433; *Gordon* v. *M. & L. R. R. Co.*, 52 N. H. 596.)
That is to say, due care and diligence in giving notice of the
change, and in running the train upon the changed time.    A
servant cannot ask for or expect more than this.    In *Rose* v.
*Boston & Albany R. R. Co.* (58 N. Y. 217), while recogniz-
ing the rule as laid down in *Flike's Case* (*supra*), it was said:
"It may be conceded that it is the duty of railroad corpora-
tions to prescribe, either by means of time-tables or by other

suitable means, regulations for running their trains with a view to their safety; but it is obvious that obedience to these regulations must be intrusted to the employes having charge of the trains; such obedience is matter of executive detail, which, in the nature of things, no corporation or any general agent of it can personally oversee, and as to which employes must be relied upon." These views seem applicable to this case. The argument for the plaintiffs' position, as we have stated it above, breaks just at the part where to be successful it ought to be the strongest. It is not true that, on an occasion like this, it is the duty of the master, or a part of his contract, to see to it, as with a personal sight and touch, that notice of a temporary and special interference with a general time-table comes to the intelligent apprehension of all those whom it is to govern in the running of approaching trains. It is utterly impracticable so to do, and a brakeman or a fireman on a train knows that it is, as well as any person connected with the business. He knows that trains will often and unexpectedly require to be stopped and started by telegraphic orders from distant points, and that such orders must, from the nature of the case, be given through servants skilled in receiving and transmitting them. If there is due care and diligence in choosing competent persons for that duty, a negligence by them in the performance of it is a risk of the employment that the co-employe takes when he enters the service. Such a variation, and the giving notice of it, is not like the supply of suitable and safe machinery, or of competent and skilled fellow-workmen. It is the act of an hour or of an instant, which for any useful effect to be got from it must be done at the instant, and that, too, from a distance. It is, from its nature and need, looked for as such. Of necessity it must be done through the best means of communication that experience, the safe and successful use of years, has demonstrated it to be prudent to employ. The act of supplying machinery or fellow-servants is one for which time may be taken and deliberation had, and it may be learned before hazard is run whether the effort at supply has been well made and is sufficient. So, in *Flike's*

*Case* (*supra*), it was easy to know before the train was started that the brakeman detailed for duty had failed to be at his place. And in *Fuller's Case* (*supra*), that the engine sent to the shop for repairs was still faulty, before it was put on the road again. Hence, it was not one of the risks of the service that the fireman, in one of those cases, and the engineer, in the other, took upon himself, that the brakeman did oversleep, or that the boiler did explode. From the nature of things, communication, on these special occasions of which we are speaking, must be had through intermediate agents, with no or but little opportunity of testing their immediate fidelity or accuracy. Would it do to lay down a rule that, when the master has chosen those agents with due care and diligence as to their skill and competency, he must further take the responsibility to his other servants that the agents thus selected will never lapse into carelessness? The alternative is, that he must in person put into the hands of each conductor and each engine-driver the general time-table and every deviation from it, or abandon the mode of supervising and directing the movement of his trains by means of telegraphic communication. The reasonable rule in such case hath this extent, and no more, that he must first choose his agents with due care for their possession of skill and competency, and that then he must use the best means of communication according to prescribed general rules and regulations devised from the best experience in such business, and if among those means is the service of a fellow-servant, competent for his place, his possible carelessness is a risk of the employment that his fellows take when entering into the service. The liability of the master to his servant arises from his duty to him or his contract with him. Expressed in general terms, that duty or contract is to supply the servant with suitable and safe machinery and appliances, with competent and skillful co-workers, and to make and promulgate sufficient rules and regulations for the conduct of the business in its ordinary run and for any extraordinary occasions that may be reasonably anticipated. It is not seriously contested but that all these things were done by the defendant. We think that

it is a misconception of the case, to hold that the order of the train-dispatcher was a change of the rules of the road, as established and promulgated by the superintendent. The train-dispatcher acted in exact accord with the general rules and regulations which foresaw and with minuteness provided for such an occasion as this, as much and as fully, so far as we can see from the case, as for the ordinary running of trains on the general time-card. The order of the train-dispatcher was but a carrying out of those rules, and an application of certain provisions of them to a case for which they were made, and the arising of which had been foreseen as probable. In what other way could they be carried out in the detail of them, but through the service of servants previously chosen and assigned to their parts? And can it with propriety be said that the parts of that detail are acts of the master, that he must do himself, or be liable for their negligent doing? The liability of the master is then made to depend upon the character of the act in the performance or non-performance of which the injury arises. If the act is one pertaining to the duty which the master owes to his servants, he is responsible to them for the manner of the performance of it. If it is one which pertains only to the duty of an operative, the employe performing it is a mere servant, and the master, although liable to strangers, is not liable to a fellow-servant for the improper performance of it. (*Crispin* v. *Babbitt, supra.*) The query then is, in the case before us, Is it the duty of the master to give personal notice to every operative of a train of a special deviation from an established general time-table, or is his duty done when he has beforehand provided rules, minute, explicit and efficient, and made them known to his servants, which, if observed and followed by all concerned, will bring such personal notice to every one entitled to it? We think that in the circumstances of this case the latter clause of the query propounds the true rule, and should be answered affirmatively. It is the duty of the master to provide rules and regulations for the running of the trains. He has done so here. One of them is, that by telegraphic message, sent at any time through operators at the

ends of the wires, to the conductor and engineer of a train, that train may be stopped at a station, or hurried forward to another, or made to go out of general order. These rules with that provision are made known to all servants. If, when the intestate entered the employment of the defendant, these rules had been read to him and his especial attention called to this one, and he had agreed to serve under it, would not he have taken the risk of the carelessness of the operators and conductor in carrying it out? Is this case any different in substance from that? Really, by entering the employment with these rules in force, he did in effect agree that special orders might be so sent. The bargain between him and the defendant was not only that special orders might be given interfering with the general time-table, but that they might be given in this way. It is this feature of the case that distinguished it from some of those that we have cited.

The case was not given to the jury on this theory. It was, in the words of the learned counsel for the plaintiff, submitted to them on the theory that " the act of the operator was the act of the master."

This we think was an error that calls for a reversal of the judgment and a new trial.

All concur, except DANFORTH and FINCH, JJ., dissenting.

Judgment reversed.